IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

**THE FIRST TAXING DISTRICT OF
THE CITY OF NORWALK,
CONNECTICUT A/K/A FIRST
DISTRICT WATER DEPARMTMENT**

                         **Plaintiff,**

       **vs.**

This Document Relates To:

MDL No. 2:18-mn-2873-RMG

**Case No.**  2:23-cv-02268-RMG

**COMPLAINT**

**JURY TRIAL DEMANDED**

**THE 3M COMPANY, f/k/a Minnesota
Mining and Manufacturing Co.;
AAA EMERGENCY SUPPLY CO.;
AGC CHEMICALS AMERICAS INC.;
AMEREX CORP.;
ANGUS FIRE;
THE ANSUL COMPANY;
ARKEMA INC.;
ARCHROMA MANAGEMENT LLC;
BASF CORPORATION;
BUCKEYE FIRE EQUIPMENT CO.;
CARRIER GLOBAL CORP.;
CHEMDESIGN PRODUCTS INC.;
CHEMGUARD INC.;
CIBA, INC.;
CLARIANT CORP., individually and as
successor in interest to Sandoz Chemical
Corporation
CORTEVA, INC., individually and as
successor in interest to DuPont Chemical
Solutions Enterprise;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS INC.,
individually and as successor in interest
to DuPont Chemical Solutions Enterprise;
DYNAX CORP;
DYNEON LLC;**

**E. I. DUPONT DE NEMOURS AND
COMPANY, individually and as
successor in interest to DuPont Chemical
Solutions Enterprise;
E-ONE, INC.;
KIDDE-FENWAL, INC., individually
and as successor in interest to Kidde Fire
Fighting, Inc.;
NATION FORD CHEMICAL CO.;
NATIONAL FOAM, INC.;
THE CHEMOURS COMPANY,
individually and as successor in interest
to DuPont Chemical Solutions Enterprise;
THE CHEMOURS COMPANY FC,
LLC, individually and as successor in
interest to DuPont Chemical;
RAYTHEON TECHNOLOGIES
CORP.;
TYCO FIRE PRODUCTS L.P.
individually and as successor in interest
to The Ansul Company;
UNITED TECHNOLOGIES CORP.; and
WILLIAMS FIRE & HAZARD
CONTROL, INC.;**

                    **Defendants.**

---

## COMPLAINT

The First Taxing District of the City of Norwalk ("Plaintiff") files this Complaint against

the Defendants The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Dyneon LLC,

E.I. DuPont de Nemours and Company, DuPont de Nemours, Inc. (f/k/a/ DowDuPont), Corteva,

Inc., The Chemours Company, The Chemours Company FC, LLC, Kidde-Fenwal, Inc., Kidde,

Inc., Kidde Fire Fighting, Inc., Amerex Corp., Angus Fire, The Ansul Company, Buckeye Fire

Equipment Co., Chemguard, Inc., National Foam, Inc. (a/k/a Chubb National Foam), Tyco Fire

Products, LP, United Technologies Corp, Raytheon Technologies Corp., Carrier Global Corp.,

2

Chubb Fire, LTD., Ciba, Inc. (f/k/a/ Ciba Specialty Chemicals Corporation), BASF Corporation, Dynax Corp., Clariant Corp., Archroma Management LLC, Arkema, Inc., ChemDesign Products, Inc., AGC Chemicals Americas Inc., Chemicals Inc., Deepwater Chemicals Inc., Nation Ford Chemical Company, AAA Emergency Supply Co., Inc., Williams Fire & Hazard Control, Inc. E-One, Inc. (collectively "Defendants"), and in support thereof alleges as follows:

## SUMMARY OF THE CASE

1.      Plaintiff brings this action for damages, contribution, and reimbursement of costs incurred, and which continue to be incurred, to address the presence of Polyfluoroalkyl substances of "PFAS" chemicals[1] found in the water supply system of Plaintiff. As the manufacturers and sellers of products that contain PFAS compounds, Defendants, have discharged PFAS into, or are otherwise responsible for PFAS released into, the waters and environment that serve as the supply sources for Plaintiff's public water supply systems.

2.      For years, Defendants manufactured, sold, and distributed PFAS compounds and products containing PFAS chemicals used in a fire-fighting suppressant agent, concentrate solution, or foam known as Aqueous Film Forming Foam ("AFFF") that contains PFAS compounds or that break down into PFAS compounds. AFFF is used primarily at chemical plants, fire-fighting locations, manufacturing locations, military facilities, landfills, and other places in the Norwalk, Connecticut area.

3.      Defendants knew, or should have known, that PFAS and related constituents in Defendants' products and by-products present unreasonable risks to human health, water quality,

---

[1] As used throughout this Complaint, "PFAS" includes but is not limited to Perfluorooctanoic acid ("PFOA"), Perfluorooctanesulfonic acid ("PFOS"), Perfluorohexanoic acid ("PFHxA"), Perfluoropentanoic acid ("PFPA"), Perfluoroheptanoic acid ("PFHpA"), Pentafluorobenzoic acid ("PFBA"), Perfluorobutanesulfonic acid ("PFBS"), Perfluorononanoic acid ("PFNA") , Perfluorodecacanoic acid ("PFDA"), and Perfluorohexane Sulfonic Acid ("PFHS").

and the environment and of the dangers associated with these compounds. Yet, Defendants handled, discharged, and were otherwise responsible for the release of PFAS into the environment without sufficient containment, caution, warning, testing, or use of alternative feasible products or components. Defendants' acts and omissions resulted in the presence of PFAS in the water sources of Plaintiff's public supply systems. As a result of the occurrence of PFAS in the environment from Defendants' products, Plaintiff has been and will be required to fund and implement capital costs, and has and will in the future incur ongoing operation and maintenance costs, in order to remove and treat for the presence of PFAS in the public water supply, and has incurred and will incur monetary damages and losses.

4.     With regard to the Defendants' tortious and wrongful conduct herein alleged, the Defendants used the U.S. mail, interstate wires, federal and state judicial systems, regulatory filings and testimony, and other vehicles to promote, conceal, protect, and continue their tortious and wrongful conduct over many, many years.

## JURISDICTION, VENUE, AND PARTIES

5.     This Court has subject matter jurisdiction under federal diversity, pursuant to 28 U.S.C. § 1332, as the citizenship of the Plaintiff is completely diverse from the citizenship of the Defendants, and the amount-in-controversy exceeds $75,000.

6.     Plaintiff brings this civil action directly in *In Re: Aqueous Film-Forming Foams Products Liability Litigation*, Multi-District Litigation ("MDL") No. 2873. Plaintiff files directly in this venue, the United States District Court for the District of South Carolina, Charleston Division, as allowed under the provisions of Paragraphs 25-29 of this Court's Case Management Order No. 3, dated April 26, 2019 (Doc. # 72). Plaintiff designates the United States District Court for the District of Connecticut as its "Home Venue" under 28 U.S.C. § 1391 because a substantial

4

part of the events giving rise to this Complaint occurred in that District. But for this Court's Order permitting direct filing in this MDL, Plaintiff would have filed in its Home Venue.

7.     Plaintiff maintains, operates, and owns a water treatment and distribution utility that serves customers in and near the Norwalk, Connecticut region. Plaintiff provides the reliable resource of water to over 42,000 citizens of Norwalk, Connecticut. Plaintiff owns and maintains four reservoirs and five wells. The reservoirs hold approximately a billion gallons of surface water collected from primarily residential areas in Lewisboro, New York, and Ridgefield, Wilton and New Caanan, Conntecticut. These four reservoirs supply, on an average year, more than 85 percent of the water delivered to Plaintiff's drinking water customers. The surface water from the resevoirs is supplemented during droughts and times of peak demand by well water from the Norwalk (Kellogg-Deering) Well Field.

8.     Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with principal offices at 974 Centre Road, Wilmington, DE 19805. DuPont does business throughout the United States, including in Connecticut. DuPont manufactured, marketed, promoted, distributed, and/or sold products or compounds containing PFOA and/or PFOS or which degraded into PFOA and/or PFOS, that were used in AFFF. Specifically, DuPont was a founding member of the Fire Fighting Foam Coalition and through its active participation in this Coalition, DuPont marketed and sold its fluorosurfactants containing PFAS to AFFF manufacturers, and DuPont suppressed, concealed, and diluted the truth, information, and data that it knew about the dangers of PFAS and its products over a very long time, all to the detriment of the Plaintiff.

9.     Defendants The Chemours Company and The Chemours Company FC, LLC are Delaware corporations with principal offices at 1007 Market Street, Wilmington, DE 19899. These Defendants are collectively referred to as "Chemours" or "the Chemours Defendants" and do

business throughout the United States, including in Connecticut. In 2015, DuPont spun off its "performance chemicals" business, including its fluoroproduct divisions and business, to Chemours. The fluoroproducts and chemical solutions businesses appear to have been transferred to both The Chemours Company and the Chemours Company FC, LLC. The Chemours Company was incorporated as a subsidiary of DuPont until approximately April of 2015, and The Chemours Company FC, LLC was formed as a subsidiary around the same time. In approximately July of 2015, Chemours assumed the operations, assets, and certain limited liabilities of DuPont's performance chemical business and began operating as an independent company. As part of this spinoff, Chemours assumed certain environmental liabilities associated with DuPont's historical business lines, including those related to PFOA/PFOS. DuPont and Chemours, as alleged in detail below, fraudulently conveyed the assets and liabilities of DuPont in this spinoff. Chemours has filed a complaint against DuPont in the Delaware Chancery Court seeking declaratory relief related to the allocation of various environmental liabilities. DuPont's creation of Chemours was for the purpose, in part or whole, of shielding DuPont and/or Chemours of certain liabilities and claims related to PFAS.

10.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with principal offices at 974 Centre Road, Wilmington, DE 19805. Corteva does business throughout the United States, including in Connecticut. Corteva was formed through a series of transactions initiated by the merger of DuPont and the Dow Chemical Company ("Dow") in August of 2017, which formed DowDuPont, Inc ("DowDuPont"). DuPont and Dow each became subsidiaries of DowDuPont. Corteva was formed as a subsidiary of DowDuPont in 2018, and in approximately June 2019, DowDuPont spun off its agricultural business to Corteva. Corteva is the parent of DuPont, holds all of DuPont's outstanding stock, and holds some of DowDuPont's assets and liabilities, including

its agricultural and nutritional businesses, which in turn likely include business lines and liabilities relating to PFAS manufacture, marketing, distribution, and/or sale. Corteva's creation is for the purpose, in part or whole, of attempting to avoid PFAS liabilities and claims.

11.    Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont) ("New DuPont") is a Delaware corporation with principal offices at 1007 Market Street, Wilmington, DE 19898. New DuPont does business in the United States, including in Connecticut. DowDuPont became New DuPont following the Corteva spinoff. New DuPont holds assets in the specialty products businesses, and the remainder of the financial assets and liabilities that DuPont held after the aforementioned spinoffs. Presumably, these assets and liabilities are valued at billions of dollars and are related to DuPont's historic PFAS manufacture, marketing, distribution, and/or sale. The creation of the New DuPont is for the purpose, in part or whole, of attempting to avoid PFAS claims and liabilities.

12.    Defendants DuPont, New DuPont, the Chemours Defendants, and Corteva are collectively referred to herein as the "DuPont Defendants." The DuPont Defendants manufactured PFAS-containing compounds for manufacture and use in AFFF products for sale and use throughout the United States, including Connecticut.

13.    Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a Delaware corporation, with its principal place of business located at 3M Center, 220-9E-02, St. Paul, Minnesota 55144.

14.    Through at least 2002, 3M manufactured PFOS for use in AFFF and other products, and it manufactured AFFF that contained PFAS compounds for sale and use throughout the United States, including Connecticut.

15.     Defendant Dyneon LLC ("Dyneon") is a subsidiary of 3M and is a Delaware corporation with principal offices at 100 S 5th Street #1075, Minneapolis, MN 55402. Dyneon does business throughout the United States, including in Connecticut, and in various other countries. At all relevant times, Dyneon manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at various chemical plants, fire-fighting locations, military facilities, manufacturing locations, landfills, and other locations throughout the United States, including the Norwalk, Connecticut area.

16.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173. Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe. Upon information and belief, beginning in 2011, Amerex designed, manufactured, marketed, distributed, and sold AFFF containing PFAS.

17.     Defendant The Ansul Company (hereinafter "Ansul") is a Wisconsin corporation, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

18.     At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained PFAS compounds, including a fire-fighting foam product named TARGET-7. Ansul initially used fluorosurfactants from Ciba-Geigy (Lodyne S-112) for Ansul's fluoro-telomerization process to manufacture AFFF. Ansul's foam was known as Ansulite of AnsulAFFF. Ansulite 3x3 was marketed as the first alcohol-resistant AFFF capable of being used on both hydrocarbon and polar solvent fuels at a 3% concentration. Additional suppliers of fluorosurfactants to Tyco/Ansul include Dynax, Chemguard, and Atochem. Tyco/Ansul's AFFF

does not contain perfluorooctane sulfonate ("PFOS") due to their telomerization process but did contain perfluorooctanoic acid ("PFOA"). Ansul's AFFF products were first sold to the U.S. Government in 1976.

19.     The Ansul Company, founded in 1912, started conducting fire-fighting training programs in 1940 at Ansul's headquarters in Marinette, Wisconsin. Ansul changed its name over the years: from 1915 to 1963 it was Ansul Chemical Company, then from 1963 to 1981, the Ansul Company, and from 1981 to 1995, Ansul Fire Protection. In 1978, Ansul was acquired by Wormald International, an Australian company in the fire protection business since 1889. Tyco International, Ltd. ("Tyco") purchased Wormald International in 1990. While Tyco sold much of Wormald to Evergreen Capital LLC in 2015, Tyco retained Ansul. Ansul now exists as a brand of Tyco Fire Products, L.P. (*infra*), marketed as a premium brand line of products.

20.     Tyco and Ansul's headquarters in Marinette, Wisconsin has been ranked among the dirtiest and worst facilities in the United States for cancer risk due to air and water releases. Ansul polluted the nearby Menominee River in Marinette, Wisconsin with heavy contamination of arsenic compounds released from 1957 to 1977. For many years, Tyco operated under orders with the Wisconsin Department of Natural Resources (Consent Order 2A-73-714) and the EPA.

21.     Chemguard, Inc. ("Chemguard") is a foreign corporation, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Tyco International acquired Chemguard in 2011. Chemguard moved its corporate headquarters to Marinette, Wisconsin, moving in with Ansul, following Tyco's acquisition.

22.     The Chemguard name continues to be used as a brand name by Tyco Fire Products, L.P. Chemguard explained the realignment as follows: "When Tyco acquired the Chemguard brand in 2011, we planned to make use of the joint best practices, industry knowledge, and

9

production synergies that come with integrating two businesses." From the press release announcing the Chemguard acquisition, Tyco declared: "We're excited about the Chemguard acquisition, which broadens our global portfolio of fire-fighting foam products and services . . . Chemguard's expertise in fire-fighting foam chemistry and applications will enhance our R&D efforts and enable us to speed our time to market with innovative products and services."

23.    At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained PFAS compounds. Chemguard makes both 3% and 6% fluorotelomer-based AFFF. Chemguard's AFFF was first sold to the U.S. Government in 1998. Chemguard also manufactured and sold its own fluorosurfactants to other AFFF manufacturers, including Defendant National Foam, Inc). Chemguard purchased other fluorosurfactants from Ciba-Geigy (Lodyne), Dynax, Chemours (Capstone), and Atochem n/k/a Archema.

24.    Defendant United Technologies Corporation ("United Technologies") is a Delaware corporation authorized to do business in New York, with principal offices at 10 Farm Springs Road, Farmington, CT 06032.

25.    Defendant Raytheon Technologies Corporation ("Raytheon") is a Delaware corporation, with principal offices at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. Upon information and belief, Raytheon is successor-in-interest to United Technologies.

26.    Tyco Fire Products, L.P. ("Tyco Fire") is a limited partnership with its principal place of business at 451 North Cannon Avenue, Lansdale, PA 19446. Founded in 1960, Tyco was formed as an investment and holding company, focused primarily on governmental research and military experiments in the private sector. In the 1980s, Tyco reorganized along broad categories of business segments, one of them being Tyco Fire. In July 1997, Tyco merged by reverse takeover with the smaller, publicly-traded company, ADT Limited. Tyco International Ltd. of

Massachusetts became a wholly-owned subsidiary of ADT Limited, and simultaneously ADT changed its name to Tyco International Ltd., retaining the Tyco stock symbol, TYC, on the NYSE. The merger moved Tyco's incorporation to Bermuda. In 2002, Tyco formed its wholly-owned subsidiary, SimplexGrinnell LP, the World's largest fire protection company. Tyco later sold off a number of its units, including its Capital division, and then in 2007 split into three separate companies: Covidien, TE Connectivity, and Tyco International Ltd. f/k/a Tyco Fire & Security and Tyco Engineered Products & Services. In 2012, Tyco again split into three separate companies: Tyco Fire, ADT, and Flow Control (acquired by Pentair which was later acquired by Emerson Electric). At some point, Tyco became Tyco International PLC, an Ireland company, with its subsidiary Tyco International (US) Inc. and operational headquarters in Princeton, New Jersey. Tyco merged into Johnson in 2016, with Johnson being the renamed parent company and assuming Tyco's PLC structure in Ireland. Tyco's CEO, George R. Oliver, who had previously been the CEO of Tyco Fire, became the CEO of the merged entity.

27.     Ansul, Chemguard, and Tyco Fire manufactured AFFF-containing PFAS or PFAS by-products for sale and use throughout the United States, including the Norwalk, Connecticut area.

28.     National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb National Foam are collectively referred to as "National Foam") is a Pennsylvania corporation, with its principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

29.     At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including in Norwalk, Connecticut.

30.    Defendant Angus Fire ("Angus") is part of Angus International, and has corporate headquarters in Bentham, United Kingdom.  Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, North Carolina 27501. At all times relevant, Angus manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including Norwalk, Connecticut.

31.    Defendant Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFAS compounds for sale and use throughout the United States, including Connecticut.

32.    Defendant Kidde Inc. ("Kidde") is a Delaware corporation authorized to do business in New York, with principal offices at One Carrier Place, Farmington, CT 06034. Upon information and belief, Kidde, was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

33.    Defendant Kidde Fire Fighting, Inc. ("Kidde Fire Fighting") is a Pennsylvania corporation with principal offices at 400 Main Street, Ashland, MA 01721. Upon information and belief, Kidde Fire Fighting was formerly known as National Foam, Inc., National Foam System, Inc., and/or Chubb National Foam, Inc.

34.    Defendant Kidde-Fenwal, Inc. ("Kidde") is a Delaware corporation with its principal place of business in Ashland, Massachusetts. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Connecticut. Kidde

manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFOA, PFOS, and other toxic substances for sale and use throughout the United States, including Connecticut.

35.    Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation, with principal offices at 13995 Pasteur Boulevard, Palm Beach Gardens, FL 33418. Upon information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business.  Upon information and belief, Carrier is the parent corporation of Kidde-Fenwal.

36.    Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

37.    Defendant Ciba, Inc. (f/k/a Ciba Specialty Chemicals Corporation) ("Ciba") is a Delaware corporation, with principal offices at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

38.    Defendant BASF Corporation ("BASF") is a Delaware Corporation, with principal offices at 100 Park Avenue, Florham Park, NJ 07932.  Upon information and belief, BASF is the successor-in-interest to Ciba.

39.    Defendant Dynax Corp. ("Dynax") is a Delaware corporation, with principal offices at 103 Fairview Park Drive, Elmsford, NY 10523.

40.    Defendant Clariant Corp. ("Clariant") is a New York corporation, with principal offices at 4000 Monroe Road, Charlotte, NC 28205.

41.     Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with principal offices at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

42.     Defendant Arkema Inc. ("Arkema") is a foreign corporation, with principal offices at 900 First Avenue, King of Prussia, PA, 19406.

43.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Delaware corporation, with principal offices at 2 Stanton Street, Marinette, WI 54143.

44.     Defendant AGC Chemicals Americas Inc. ("AGC") is a Delaware corporation, with principal offices at 55 E Uwchlan Ave, Suite 201, Exton, PA 19341.

45.     Defendant Chemicals Inc. is a Texas corporation, with principal offices at 12321 Hatcherville Road, Baytown, TX 77521.

46.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation, with principal offices at 196122 E County Road 40, Woodward, OK 73801.

47.     Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation, with principal offices at 2300 Banks Street, Fort Mill, SC 29715.

48.     Upon information and belief, Defendants Chemicals, Inc., Deepwater, and Nation Ford designed, manufactured, marketed, distributed, and sold fluorosurfactant products containing PFAS for use in the manufacture of AFFF products.

49.     Collectively, Defendants 3M, Dyneon, Tyco, Buckeye, Chemguard, United Technologies, Raytheon, Kidde, Kidde Fire Fighting, Kidde-Fenwal, Angus Fire, National Foam, Carrier, Chubb, DuPont, Ciba, BASF, Clariant, Archroma, Arkema, ChemDesign, AGC, Chemicals, Inc., Deepwater, and Nation Ford are referred to in this Complaint as the "Manufacturer Defendants."

50.     Defendant AAA Emergency Supply Co., Inc. ("AAA Emergency Supply") is a New York corporation, with principal offices at 635-637 White Plains, NY 10603.

51.     Defendant Williams Fire & Hazard Control, Inc. ("Williams") is a Texas corporation, with principal offices at 9605 Richard Wycoff Drive, Port Arthur, TX 77640.

52.     Defendant E-One, Inc. (f/k/a Emergency One, Inc.) ("E-One") is a Delaware corporation, with principal offices at 1601 SW 37th Avenue, Ocala, FL 34474.

53.     Collectively, Defendants AAA Emergency Supply, Williams, and E-One are referred to in this Complaint as "Distributor Defendants."

54.     All Defendants have committed the tortious acts alleged herein within the State of Connecticut, specifically in the Norwalk, Connecticut area.

## POLYFLUOROALKYL SUBSTANCES

### I.     OVERVIEW

55.     PFAS compounds are a family of manmade chemicals, also known as perfluorochemicals ("PFCs"), which have been created and used for decades to make products that resist heat, oil, stains, grease, and water.

56.     PFAS were first invented in the 1930s.

57.     The two most widely known and studied PFAS are PFOA and PFOS.

58.     PFOS, a perfluoroalkyl sulfonate, is an environmentally persistent anthropogenic chemical that is produced synthetically.

59.     PFOA, a perfluooralkyl carboxylate, is an environmentally persistent anthropogenic chemical also produced synthetically.

60.    In the 1940s and 1950s, 3M began creating PFAS chemicals and compounds and incorporating them into certain of their products.  3M not only used PFAS chemicals in its own products but also sold them to other companies for use in AFFF.

61.    PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid, and are thus effective for products which require fire resistance, and oil, stain, grease, and water repellency.

62.    PFAS are used or have been found in fire-fighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

63.    AFFFs were introduced commercially into U.S. environment in the mid-1960s, becoming the primary fire-fighting foam in the United States and other parts of the World. AFFF is water-based and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

64.    In or around 1966, AFFF containing PFAS was patented as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and fire-fighting training facilities.

65.    Since then, AFFF, and other Class B fluorine-containing fire-fighting foams have been used for fire suppression of flammable liquid fires and flammable vapor suppression at fire training facilities throughout the United States, as well as at military installations and civilian airports. One of these was the Airport, pursuant to a lease agreement between the County and the United States.

66.    In 1969, the Department of Defense ("DOD") issued military specification MIL-F-24385 (amended in 1992), which includes the requirements for AFFF liquid concentrate to contain

either 3% or 6% PFAS. MIL-F-23485 refers to 3% AFFF concentrate as "Type 3" and 6% AFFF concentrate as "Type 6." MIL-F-23485 superseded MIL-F-23905B (AS), dated April 1967.

67.     AFFFs are synthetically formed by combining fluorine free hydrocarbon foaming agents with highly fluorinated surfactants. When mixed with water, the resulting solution has the characteristics needed to produce an aqueous film that spreads across the surface of a hydrocarbon fuel.

68.     The AFFF coats the fire, blocking the supply of oxygen and creating a barrier to extinguish the vapors. A film also forms to smother the fire after the foam has dissipated.

69.     It is this film formation feature that provides fire extinguishment and is the source of the designation, aqueous film forming foam or AFFF.

70.     Thousands of gallons of foam solution may be applied during a single release or discharge of AFFF.

71.     If it is not contained, the AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, sewers, surface water, and/or groundwater.

72.     AFFFs contain PFAS in their concentrate and formulation and/or has known or foreseeable by-products when the AFFFs are released into the environment.

73.     Once PFASs enter the environment, they are extremely persistent and resistant to typical environmental degradation processes.  In addition, PFASs are thermally stable synthetic organic contaminants, are carcinogenic, and cause ill effects to humans, animals, and aquatic life. PFASs also have high water solubility (mobility), low biodegradation (persistence), and high bioaccumulation in humans, animals, and aquatic life.

74.     Upon information and belief, there have been thousands of PFAS compounds manufactured, distributed, and sold in the United States.

75.     PFASs, in particular PFOS and PFOA, have been identified as "emerging contaminants" by the United States Environmental Protection Agency ("EPA").  This term describes contaminants about which the scientific community, regulatory agencies, and the general public have a new and increasing awareness or understanding about how they affect the environment or public health.

76.     PFASs, like other emerging contaminants, have become the focus of active research and study, which means that new information is released periodically regarding the effects on the environment and human health as a result of exposure to the chemicals.

77.     Certain PFAS compounds, such as PFOS and PFOA (also known as "C8" because it contains eight carbon compounds), have been the focus of the many state regulatory authorities and the EPA, as well as environmental interest groups.

## II.    Health Risks

78.     EPA studies, as well as studies conducted and/or paid for by DuPont and 3M, have indicated that exposure to PFOA and PFOS over certain levels can result in adverse health effects, including but not limited to developmental effects to fetuses during pregnancy or to breastfed infants (*e.g*., low birth weight, accelerated puberty, skeletal variations), cancer (*e.g*., testicular, kidney, pancreatic), liver effects (*e.g*., tissue damage), immune effects (*e.g*., antibody production and immunity), thyroid effects, and other effects (*e.g*., cholesterol changes).

79.     In January of 2009, the EPA established a drinking water Provisional Health Advisory Level ("HAL") for PFOA and PFOS, the two PFAS compounds about which it had the most toxicological data. EPA set the Provisional HAL at 0.4 parts per billion (ppb) for PFOA and 0.2 ppb for PFOS.

80.     In May 2016, EPA issued new HALs for PFOA and PFOS, identifying 0.07 ppb (or 70 parts per trillion (ppt)) as the concentration of PFOA or PFOS in drinking water at or below which health effects are not anticipated to occur over a lifetime of exposure.

81.     In issuing its 2016 HALs, EPA directed that when both PFOA and PFOS are found in drinking water, the *combined* concentrations of PFOA and PFOS should be compared with 70 ppt health advisory level.

82.     In connection with its emerging contaminant studies, EPA implemented an Unregulated Contaminant Monitoring Rule Number 3 in 2012 ("UCMR 3"), which was designed to collect nationwide information regarding the occurrence of PFAS contamination in the public's water supply.

83.     UCMR 3 required sampling of Public Water Systems ("PWSs") serving more than 10,000 people (i.e., large systems) and 800 representative PWSs serving 10,000 or fewer people (i.e., small systems) for 21 chemicals, including a number of PFASs, during one consecutive twelve-month period in the timeframe between 2013 through 2015.

84.     Sampling under UCMR 3 used higher reporting limits than would be applicable in light of scientific information and guidance levels developed since that time, which are much lower than those employed in 2008 and 2009.

85.     In addition, the UCMR 3 sampling effort did not combine PFAS levels, thus not taking into account added effects from the presence of more than one PFAS compound as ILEPA has recognized is appropriate.

86.     Studies completed in 2015 on PFAS by the Agency for Toxic Substances and Disease Registry ("ATSDR"), the Public Health Service and the U.S. Department of Health and

Human Services, show that in addition to PFOA and PFOS, other PFAS may have adverse effects on human health and the environment.

87.    The ATSDR and the U.S. Department of Health and Human Services prepared a Draft Toxicological Profile for Perfluoroalkyls that was released for public comment on June 20, 2018 ("2018 ATSDR DTP").

88.    The 2018 ATSDR DTP was prepared pursuant to 42 U.S.C. § 9604(i), and characterizes the toxicological and adverse health effects for 14 PFAS.

89.    The 2018 ATSDR DTP sets provisional minimal risk levels for the PFAS analyzed and concludes that several of the PFAS have long half-lives in humans and that there are associations between PFAS exposure and several adverse health outcomes.

90.    The 2018 ATSDR DTP also finds that there is suggestive evidence that PFOA and PFOS are carcinogenic.

91.    While more studies have been conducted, and thus, more is known regarding PFOS and PFOA, all PFAS compounds have generally demonstrated similar characteristics to PFOS and PFOA.

92.    Although some PFAS compounds have been shown to break down, the resulting products typically end at non-biodegradable PFOA and PFOS.

93.    Studies have shown that PFOS and PFOA, and other PFAS, have the potential to bio-accumulate and bio-magnify in wildlife and humans.

94.    The EPA acknowledges that the studies associated with PFAS compounds are ongoing, and as such, the HALs may be adjusted based upon new information.  In EPA's February 2020 "PFAS Action Plan: Program Update", the agency included information on a newly approved laboratory method—Drinking Water Method 533—for testing and detecting PFAS in drinking

water. This new method will allow for more effective measurement of PFAS in drinking water. EPA also announced that it plans to provide for further monitoring of PFAS in the next UCMR sampling cycle.

95.    Additionally, in March, 2023, in a significant step to tighten the federal health-based standards, the EPA announced it was gathering the information on PFOA, PFOS, and other PFAS substances necessary to begin the process of establishing legally enforceable levels as part of the national primary drinking water regulation for PFOA and PFOS.

**III.    AFFF and Component Product Manufacturers**

96.    As manufacturers, sellers, handlers and dischargers of PFAS compounds, and products containing PFAS, Defendants knew or should have known that the inclusion of PFAS chemicals in any products presented an unreasonable risk to human health and the environment.

97.    Upon information and belief, since the 1960s, AFFFs that meet MIL-F-24385 specifications were developed in coordination with the DOD to extinguish fires at military bases, airports, oil refineries, and fire-fighting training facilities throughout the United States by a number of manufacturers and/or their subsidiaries, including 3M, Tyco, Buckeye, Chemguard, United Technologies, Kidde, Kidde Fire Fighting, Angus Fire, National Foam, and Chubb. Defendant 3M was the only manufacturer of PFOS.

98.    Upon information and belief, Chubb, through its association with National Foam, obtained patents under the name Chubb National Foam, Inc. for AFFF and similar fire-fighting foams, and manufactured AFFF for the DOD under the name Chubb National Foam, Inc.

99.    Upon information and belief, Defendants 3M, Tyco (and its predecessor Ansul), Buckeye, Chemguard, National Foam, Kidde, Carrier, Angus Fire, and Chubb (through its

association with National Foam) all developed, designed, manufactured, marketed, sold and distributed AFFF containing PFAS.

100.    Upon information and belief, Defendants DuPont, Ciba, BASF, Dynax, Clariant, Chemours, Chemours FC, Archroma, Arkema, ChemDesign, and AGC all designed, manufactured, marketed, distributed, and sold fluorosurfactant products for use as component products in the manufacture of AFFF.

101.    Upon information and belief, Defendants Chemicals, Inc., Deepwater, and Nation Ford all designed, manufactured, marketed, distributed, and sold products containing PFAS and/or their chemical precursors for use in the manufacture of AFFF and AFFF component products.

102.    Upon information and belief, Defendants AAA Emergency Supply, Williams, and E-One distributed AFFF products manufactured and sold by 3M for use at the Airport.

103.    Upon information and belief, the Manufacturer Defendant and Distributor Defendants knew of the risks of PFAS to the environment and health.

104.    Indeed, Defendant 3M knew of the potential threats posed by AFFF by at least 1970.

105.    In the November 1970 issue of *Fire Journal*, the National Fire Protection Association (NFPA) published a letter by S.I. Kalkstein, the President of Chemical Concentrates Corporation titled "Toxicity of 'Light Water' to Fish,", which advised that tests of 3M's AFFF product demonstrated that it was so "highly deleterious to marine life . . . [that] the entire test program had to be abandoned to avoid severe local stream pollution." *Letters to the Association*, Fire Journal, Nov. 1970, at 87.

106.    Indeed, a 1970 3M study revealed a lethal dose of PFAS in fish at 1 part per million (ppm), the lowest concentration tested.  At this concentration, the fish were unable to swim upright

and died within weeks of being exposed to PFAS.  The fish that received a dose of PFAS at 4 ppm died within days; at 12.5 ppm the fish died within hours; and at 125 ppm the fish died within minutes.

107.    In response to Kalkstein's letter, Hugh G. Bryce,  the Technical Director of 3M's Chemical Division, wrote that 3M conducted  tests to evaluate the safety of its AFFF products and that "tak[ing] into account the remote possibility that significant quantities of the fire-extinguishing agent would enter a body of water, as well as the fact that relatively high levels can be tolerated, it appears from a practical point of view that the use of 'Light Water' brand agents could not have any significant adverse effect on fish or other marine life in either fresh or salt water." *Id.*

108.    As members of the NFPA and leading manufacturers in the industry, the Manufacturer Defendants knew or should have known of the potential harmful effects of AFFF as Kalkstein advised in his letter.

109.    In 1975, 3M, the sole manufacturer of PFOS, learned that PFOS was present in the blood of the general population.  In 1976, 3M confirmed that PFAS was bioaccumulating in the blood of its employees.

110.    In 1978, 3M conducted a study of PFAS toxicity in Rhesus monkeys in which every monkey involved in the study died.

111.    3M repeated the Rhesus monkey experiment at a low dose of 4.5 ppm of PFAS, and still, every monkey involved in the study died.

112.    Upon information and belief, Defendant 3M continued to produce PFAS until 2002, and sold AFFF containing PFOS until 2003.

113.    The Manufacturer Defendants had a duty, which they breached, to notify the EPA when they had information that reasonably supported the conclusion that a substance or mixture presented a substantial risk of injury to health or the environment. *See* Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

114.    At all times relevant to this Complaint, no containment measures were listed in Safety Data Sheets ("SDS" (f/k/a/ Material Safety Data Sheets ("MSDS")), nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, and product packaging for AFFF.

115.    MSDS for certain AFFF products directed users to collect AFFF prior to discharging to a wastewater treatment system and/or to contain liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

116.    At all times relevant to this Complaint, the MSDS and SDS instructions, warning labels, and product packaging did not fully describe or adequately warn users of all of the health and environmental risks of AFFF, which Defendants knew or should have known existed, or of all of the precautions they should have taken, which Defendants knew or should have known existed and were necessary.

117.    Upon information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles.

118.    Upon information and belief, AFFF containing other PFAS compounds with six carbon atoms ("Short Chain PFAS"), rather than 8 carbon atoms ("Long Chain PFAS") (like PFOS and PFOA) continue to be developed, manufactured, and sold by the Manufacturer Defendants.

119.    Defendants knew or should have known at the time they put their AFFF products into use and into the environment that PFAS compounds are highly soluble in water, highly mobile,

toxic, extremely persistent, bio-accumulative, and highly likely to contaminate water supplies if released to the environment.

120.    Defendants' actual and/or constructive knowledge of the adverse impacts from PFAS compounds to human health and the environment amounts to reckless disregard to human health and environmental safety. Nonetheless, Defendants negligently and recklessly manufactured and sold PFAS and products containing PFAS with no warnings or instructions on use or disposal to avoid contamination.

121.    Motivated by billions of dollars in profits, the DuPont Defendants and 3M have intentionally withheld, suppressed, minimized, diminished, marginalized, misrepresented, and obfuscated factual information in their possession regarding the toxic effects of PFASs on the environment, animal health, aquatic life, and human health.

122.    Defendants, or some of them, applied for and received various patents regarding their AFFF products over many years, including alternative feasible products such as fluorine-free foam concentrates.

123.    Defendants' actions have directly resulted in contamination of Plaintiff's water supply. Because Defendants' PFAS has infiltrated the waters that serve as the sources for Plaintiff's public water supply systems, this contamination is recurring and continuing.

## ILLEGAL TRANSFERS BETWEEN THE DUPONT DEFENDANTS

124.    In approximately 2014, DuPont formed Chemours as its subsidiary company. At that time, Chemours apparently had a board of directors, but that board was controlled by DuPont.

125.    In July of 2015, DuPont transferred its "performance chemicals" business to The Chemours Company. Around the same time, The Chemours Company FC, LLC was formed as a subsidiary of The Chemours Company. The transfer of the "performance chemicals" business

25

included fluoroproducts, and chemical solutions. The fluoroproducts and chemical solutions transfers appear to have been made to The Chemours Company and the Chemours Company FC, LLC (again, collectively "Chemours").

126.    In addition to the transfer of these business lines, Chemours assumed various liabilities for DuPont's prior use, manufacture, and discharge of PFAS, although the specific details regarding the liabilities assumed by Chemours are not publicly available.[2]

127.    The DuPont-Chemours transfer included incredible amounts of debt and multiple failing product lines. Significantly, DuPont pinned on Chemours its historic (and future) environmental liabilities, which were known by DuPont to be massive. Chemours did not receive a reasonably equivalent value in exchange for this transfer of obligation. Likewise, the assets transferred to Chemours were unreasonably small in relation to the business or transaction. DuPont knew or reasonably should have known that Chemours would incur debts beyond its ability to pay them when they became due.

128.    At the time of the DuPont-Chemours transfer, the DuPont performance chemicals business held an estimated debt of approximately $4 billion.

129.    At that same time, DuPont announced that it planned to phase out production and use of PFOA, a major component of its fluoroproducts line, by 2015.

130.    Per the Separation Agreement governing the DuPont-Chemours transfer, Chemours agreed to indemnify DuPont against, and assumed for itself, all of DuPont's liabilities from DuPont's performance chemicals business, with no time limitation. This indemnification remains

---

[2] For instance, various of The Chemours Company's and DuPont's public filings indicate that both The Chemours Company and the Chemours Company FC, LLC were transferred assets that include fluoroproducts and chemical solutions business lines.

uncapped. Chemours also agreed to indemnify DuPont against, and assume for itself, the performance chemical liabilities without regard to the nature of the liabilities, when they were incurred or arose, or which entity is named as the responsible party. Chemours further agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the performance chemicals business, which would be based on a determination made by DuPont that the liability was 50.1% attributable to DuPont's performance chemicals operations.

131.    Chemours also agreed to substitute itself for DuPont with regard to any order, decree, judgment, agreement or action relating to the environmental liabilities it assumed.

132.    At the time of the DuPont-Chemours spinoff in 2015, DuPont was fully aware of its potential liabilities related to PFAS contamination throughout the United States.

133.    After the spinoff, new members of the Chemours board were appointed. The spinoff and related decisions were conducted while DuPont controlled the board. The new Chemours board did not take part in the separation.

134.    DuPont's knowledge and assessment of its liabilities—including environmental and other performance chemicals liabilities—have been comprehensive since it began its performance chemical operations, and its litigation-related liabilities have been increasing since at least the early 2000's. For example, in 2005, DuPont agreed to pay $16.5 million to resolve claims brought by the EPA for violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act related to its PFAS compounds. Although seemingly small, this was the largest such PFC-related penalty in history at the time it was levied.

135.    Relatedly and also in 2005, DuPont incurred hundreds of millions of dollars of liability related to litigation against it for the health risks of its PFOA use and disposal in Ohio and

West Virginia relating to its Washington Works facility in Parkersburg, West Virginia, which had caused thousands of people to receive serious medical diagnoses, including cancer, attributable to DuPont's PFAS pollution of the environment, including drinking water supplies.

136.    In 2016, Chemours acknowledged in an SEC filing that the anticipated outcomes in the Ohio litigation could materially and adversely affect Chemours' financial positions in terms of its operations and liquidity.

137.    Subsequently, DuPont and Chemours agreed to pay $671 million to resolve the Ohio claims. Chemours and DuPont each additionally agreed to pay $25 million annually for future PFOA-related costs not covered by the settlement for the following five years.

138.    At the time of the DuPont-Chemours spinoff, DuPont had been sued, had been on notice of impending suits, and/or actually knew of likely litigation and its liability for damages and injuries from the manufacture of PFAS and products that contain PFAS. Chemours' assumptions of liability were not limited to PFAS-related conduct; it also assumed various environmental liabilities related to prior, pending, and future litigation regarding other performance chemicals, such as benzene.

139.    The intent and effect of creating Chemours was to allocate an enormous portion of DuPont's environmental liabilities, including liabilities related to its PFAS chemicals and products. DuPont and Chemours effectuated this spinoff with the knowledge that Chemours would be insolvent and would not be able to bear the liabilities that DuPont transferred to Chemours. DuPont and/or Chemours engaged in this process with the actual intent to deceive. This fraudulent conveyance has likely limited the availability of funds to cover DuPont's liabilities, including for the claims that arise out of this case, which has and will further harm Plaintiff.

140.    DuPont has continued its plan to avoid PFAS liabilities more recently, and in

similar methods to the Chemours maneuvers, by creating Corteva, Dow-DuPont, and the New DuPont.

## PLAINTIFF WATER PROVIDER

141.    Plaintiff is committed to the supply of high-quality drinking water consistent with federal and state guidelines and requirements. Plaintiff desires to deliver the best possible quality of drinking water without any of Defendants' contaminants in the raw or finished water.

142.    As a result of Defendants' PFAS contamination of certain and various water sources with AFFF products and by-products, Plaintiff has incurred, and will continue to incur, significant costs, for ongoing measures, monitoring, capital improvements, and operational expenses that reduce and/or remove PFAS contamination from the raw water sources in order to provide quality finished drinking water for consumers in the Norwalk, Connecticut area.

## PFAS TESTING

143.    Plaintiff owns and maintains four resevoirs and five wells. The resevoirs hold approximately a billion gallons of surface water collected from primarily residential areas in Lewisboro, New York, and Ridgefield, Wilton, and New Caanan, Conntecticut. These four reservoirs supply, on an average year, more than 85 percent of the water delivered to Plaintiff's drinking water customers. The surface water from the reservoirs is supplemented during droughts and times of peak demand by well water from the Norwalk (Kellogg-Deering) Well Field.

144.    In 2018, the Connecticut Department of Public Health issued a recommendation that water utilities test for PFAS utilitizing new technology.  Plaintiff promptly heeded this recommendation and tested for PFAS at the reservoirs and wells. The testing detected the presence of several PFAS compounds.

145.    The concentration of PFAS in treated well water ranged from 21 ppt to 38 ppt.

PFAS concentrations in the reservoirs and treated surface waters averaged 5 ppt. The PFAS concentrations at six representative locations within Plaintiff's water distribution system ranged from 3 to 13 ppt for five PFAS compounds.

146.    In 2019, Plaintiff tested treated surface and well water for PFAS compounds, and Plaintiff detected the presence of PFOS and PFOA. In treated well water, Plaintiff detected PFOA in amounts ranging from 6 ppt to 20 ppt and PFOA in amounts ranging from 5 to 9 ppt. In treated surface water, Platintiff detected PFOS in amounts ranging from 2 to 3 ppt and PFOA in amounts ranging from 2 to 5 ppt. As a result of the testing, two District wells with the highest PFAS levels were taken offline.

## COUNT ONE – STRICT LIABILITY AGAINST ALL DEFENDANTS

147.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

148.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals and products containing PFAS, either as a necessary component of their products or a foreseeable and/or known by-product(s), which Defendants knew or should have known would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's public water supply system, thereby causing damage to Plaintiff.

149.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds would have on the environment and the activities and rights of others.

150.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, and the foreseeable risk that their PFAS-containing products and by-products would be discharged, released, or disposed of in the environment.

151.    By causing PFAS contamination and the resulting impact to Plaintiff's public water supply systems, Defendants engaged in abnormally dangerous activity for which they are strictly liable.

152.    As a result of Defendants' abnormally dangerous activity, Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, and removal costs and damages related to PFAS contamination.

## COUNT TWO – STRICT LIABILITY (FAILURE TO WARN) AGAINST ALL DEFENDANTS

153.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

154.    Defendants engaged in the design, manufacturing, marketing, and sales of PFAS chemicals, products, and by-products containing PFAS, which Defendants knew or should have known, would result in contamination of the environment, including the waters that serve as the water source for Plaintiff's public water supply systems, thereby causing damage to Plaintiff.

155.    Defendants knew or should have known of the adverse impacts the exposure to its PFAS compounds, chemicals, products, and by-products would have on the environment and the activities and rights of the Plaintiff and others.

156.    Defendants knew or should have known of the persistence and high mobility of PFAS in the environment, the bioaccumulation of PFAS in humans, animals, and aquatic life, and the foreseeable risk that their PFAS and PFAS-containing products would be discharged, released, or disposed of in the environment.

157.    Defendants should have known the chemical ingredients and formulas of their products, and the by-products of their products once they entered the environment.

158.    Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants to be used without adequate safety measures poses a substantial likelihood of resulting in PFAS contamination in the areas in which they were used, proximately resulting in the PFAS contamination.

159.    Use of the Manufacturer Defendants' AFFF products in the exact manner in which they were designed by the Manufacturer Defendants did in fact result in PFAS contamination in the areas in which they were used, proximately resulting in the PFAS contamination.

160.    The Manufacturer Defendants knew or should have known that the use of their AFFF products in the exact manner in which they were designed to be used, would result in PFAS contamination in the areas in which they were used, proximately resulting in the PFAS contamination.

161.    Knowing of the dangerous and hazardous properties of their products, the Manufacturer Defendants had a duty to warn of the hazards associated with their projects contaminating the environment, including drinking water.

162.    The Manufacturer Defendants' AFFF products containing PFAS should not have been manufactured in the particular design they were, but having been manufactured, adequate instructions and warnings should have been provided with the products.

163.    Defendants failed to provide warnings or instructions sufficient to notify the users and/or the public and/or the Plaintiff of the dangers inherent in Defendants' products and by-products.

164.    Defendants' failure to provide proper and adequate notice or instruction regarding the dangers of their products and by-products to human health and the environment rendered

Defendants' PFAS-containing products and PFAS by-products unreasonably dangerous for the purposes intended and promoted by Defendants.

165.    Defendants' duty to warn is and was a non-delegable duty.

166.    The DuPont Defendants and 3M also intentionally, recklessly, and without regard for human life and the environment covered up, suppressed, withheld, obfuscated, minimized, and otherwise misrepresented the facts they had with regard to the PFAS chemicals, compounds, products, and by-products as such relate to the persistence and high mobility of PFAS in the environment, the bio-accumulation of PFAS in humans, animals, and aquatic life, and the environmental fate and transport. The DuPont Defendants and 3M not only failed to warn the public and the Plaintiff of same, but, at various times, failed to warn certain manufacturers and sellers of AFFF including some of the Defendants in this civil action.

167.    This failure to warn or adequately instruct regarding the dangers associated with use of Defendants' products directly and proximately caused harm and damages to Plaintiff.

168.    Had the Manufacturer Defendants provided adequate warnings, measures could have been taken to avoid or decrease exposure to PFAS.

169.    Had the Manufacturer Defendants provided adequate warnings, the users of AFFF at the Airport could have taken steps to reduce or prevent the release of PFAS into the environment.

170.    Adequate warnings should have included, but are not limited to:

a.  a warning not to allow the AFFF to enter soils, sediment, groundwater, or waterways;

b.  a warning to immediately collect AFFF upon use; and

c.  a warning that, because the Manufacturer Defendants' AFFF contained constituents such as PFAS, which pose risks to human health and the

33

environment, use of AFFF containing PFAS requires immediate containment, remediation and removal after use.

171.    The Manufacturer Defendants' failure to provide adequate and sufficient warnings for the AFFF products they manufactured, marketed, and sold rendered the AFFF a defective product.

172.    Because, or to the extent, the AFFF products were used exactly as designed, the harm resulting from their use was reasonably foreseeable, and thus proximately caused by the Manufacturer Defendants' actions or inaction.

173.    As a direct and proximate result of the Manufacturer Defendants' defective design of the AFFF products, the Airport and other County property is contaminated by PFAS, proximately resulting in damages to the County.

174.    The failure to warn and deceptive conduct of the DuPont Defendants and 3M, as to the public, the Plaintiff, and certain manufacturers and sellers of AFFF including some of the Defendants in this civil action, constitutes reprehensible, outrageous, and fraudulent conduct, justifying an award of punitive damages as against the DuPont Defendants and/or 3M for failure to warn.

## COUNT THREE – STRICT LIABILITY (DESIGN DEFECT) AGAINST ALL DEFENDANTS

175.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

176.    Defendants herein, at all times relevant, were in the business of the design, manufacture, sale and distribution of PFAS-containing products, chemicals, and compounds,

and/or the foregoing use of which created PFAS in the environment as part of the foreseeable use of AFFF products.

177.    Defendants designed, manufactured, marketed, and sold defective products that were unreasonably dangerous for their intended use. The AFFF manufacturing Defendants either knew of the dangers contained in their AFFF products or chose to ignore the chemicals, compounds, and by-products of their AFFF products.

178.    When Defendants placed their PFAS-containing AFFF products into the stream of commerce, the products were defective, unreasonably dangerous, and not fit, suitable, or safe for the intended, foreseeable, and ordinary uses.

179.    The products designed, manufactured, sold, and distributed by Defendants reached consumers and users without substantial change to the condition and nature of the products. The Defendants made their AFFF products pursuant to their own formulas, research, design specifications, and testing.

180.    Defendants, with knowledge of the risks associated with the use of PFAS compounds, failed to use reasonable care in the design of PFASs.

181.    The defects in Defendants' products existed at the time the product left Defendants' control and were known to Defendants.

182.    Reasonable safer alternatives exist and were available to Defendants at all relevant times.  In fact, many of the Defendants patented feasible alternative products. Thus, the risks of Defendants' products outweighed the benefits.

183.    The defects in Defendants' products proximately caused and have directly resulted in the damages of which Plaintiff complains.

## COUNT FOUR – NEGLIGENCE AGAINST ALL DEFENDANTS

184.   Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

185.   Defendants had a duty to exercise due or reasonable care in the manufacture, distribution, and use of its PFAS chemicals and PFAS-containing products so as to avoid harm to those who would be foreseeably injured by PFAS environmental contamination.

186.   Defendants knew or should have known that their PFAS products would result in the release, discharge, or disposal of PFAS compounds into the environment that would lead to contamination of drinking water supplies and hazards to human health if not treated.

187.   By failing to exercise due care in the design, manufacturing, marketing, testing, promotion, and environmental sampling of their PFAS compounds and/or their PFAS-containing AFFF products, Defendants breached their duty to avoid harm to Plaintiff.

188.   The DuPont Defendants and 3M negligently failed to share, publish, or otherwise expose their internal testing, employee health information, fate and transport studies, and knowledge of the adverse effect of their products on humans, animals, and aquatic life. The DuPont Defendants and 3M also intentionally, recklessly, and without regard for human life and the environment covered up, suppressed, withheld, obfuscated, minimized, and otherwise misrepresented the facts they had with regard to the PFAS chemicals, compounds, products, and by-products as such relate to the persistence and high mobility of PFAS in the environment, the bio-accumulation of PFAS in humans, animals, and aquatic life, and the environmental fate and transport. The DuPont Defendants and 3M not only negligently failed to inform the public and the Plaintiff of same, but, at various times, failed to warn certain manufacturers and sellers of AFFF including some of the Defendants in this civil action. The failure to warn and deceptive conduct of the DuPont Defendants and 3M, as to the public, the Plaintiff, and certain manufacturers and

sellers of AFFF including some of the Defendants in this civil action, constitutes reprehensible, outrageous, and fraudulent conduct, justifying an award of punitive damages as against the DuPont Defendants and/or 3M for failure to warn.

189.    As a result of Defendants' negligence, Plaintiff has incurred, and will continue to incur, investigation, cleanup, remediation, abatement, and removal costs and damages related to PFAS contamination.

190.    Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of Plaintiff.

191.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer damages.

## COUNT FIVE – PRIVATE NUISANCE AGAINST ALL DEFENDANTS

192.    Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

193.    Through Defendants' acts and omissions, Defendants' PFAS and PFAS-containing products have directly and proximately caused environmental contamination that has physically invaded Plaintiff's water supply, and unreasonably interfered with, and continues to interfere with, Plaintiff's use and enjoyment of its public water supply systems and the water sources that supply those systems.

194.    The private nuisance created by Defendants is continuing.

195.    Defendants have failed, and continue to fail, to abate the private nuisance.

196.    As a result of the private nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages, including investigation, cleanup, remediation, and removal costs

and damages related to the detection, treatment, and removal of PFAS constituents that have and will continue to migrate into Plaintiff's water supplies.

## COUNT SIX – PUBLIC NUISANCE AGAINST ALL DEFENDANTS

197.     Plaintiff hereby incorporates by reference the allegations set forth in the foregoing paragraphs of this Complaint as if they were set forth fully herein.

198.     Through Defendants' acts and omissions, Defendants' AFFF and PFAS-containing AFFF products and their by-products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to a clean environment, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

199.     Through Defendants' acts and omissions, Defendants' AFFF and PFAS-containing products and by-products have directly and proximately caused environmental contamination that has unreasonably interfered with, and continues to interfere with, Plaintiff's right to the use of waters that serve as a source of potable water, which right Plaintiff holds in common with members of the public, and which right is specifically permitted.

200.     The public nuisance created by Defendants is continuing.

201.     Defendants have failed, and continue to fail, to abate the public nuisance. The DuPont Defendants and 3M, in other places in the United States, have paid hundreds of millions of dollars to settle civil lawsuits in attempts to remedy public water supplies and the persons directly affected adversely from drinking water in those other places. Despite this, the Plaintiff expects that the DuPont Defendants and 3M in this civil action will deny that they engaged in these very same wrongful activities and conduct in the Norwalk, Connecticut area. The DuPont

Defendants and 3M have made such baseless denials in other lawsuits filed by other water providers to date.

202.    As a result of the public nuisance, Plaintiff has suffered and continues to suffer, significant harm and damages special to Plaintiff and different in kind from those the general public may have suffered, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's water supplies such that Defendants should be required by injunction to abate the nuisances they have created.

## COUNT SEVEN – VOIDABLE TRANSACTION VIOLATIONS AGAINST THE DUPONT DEFENDANTS

203.    Plaintiff realleges and reaffirms each and every allegation set forth in the foregoing paragraphs as if fully stated herein.

204.    Plaintiff seeks all relief available under the Connecticut Uniform Fraudulent Transfer Act for the DuPont Defendants' violations, CT ST§ 52-552, *et seq.* for their voidable transactions as part of their various spinoff transactions.

205.    The DuPont Defendants engaged in acts in furtherance of a scheme to transfer DuPont's assets so that parties in PFAS litigation, such as Plaintiff, could not obtain funds or collect a judgment which they are or will be owed. As a result of the DuPont Defendants' acts, omissions, and other conduct described herein, Plaintiff has been damaged.

206.    At all relevant times, the DuPont Defendants have (1) acted with actual intent to hinder, delay, and defraud parties; (2) acted without receiving a reasonably equivalent value in exchange for the transfer obligation arising out of the DuPont-Chemours spinoff; and/or (3) were engaged or were about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business or that the business intended to incur, or those

liabilities the DuPont Defendants believed or reasonably should have believed that Chemours would incur.

207.    For decades, DuPont manufactured, marketed, distributed, and/or sold PFAS chemicals or compounds for use in AFFF and/or that the DuPont Defendants knew would create PFAS by-products when AFFF was used for its intended purpose, with the DuPont Defendants having superior knowledge that they were toxic, mobile, persistent, bio-accumulative, and biomagnifying, and through normal and foreseeable use, would impact groundwater, Plaintiff's water supplies and other natural resources.

208.    As a result of the transfer of assets and liabilities described herein, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from their manufacture, marketing, distribution, and/or sale of compounds or chemicals for use in AFFF products.

209.    At the time of the transfer of its performance chemical business to Chemours, DuPont had been sued, had notice of suits, and/or had knowledge of likely litigation regarding DuPont's liability from the manufacture, marketing, distribution, and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

210.    The DuPont Defendants acted without receiving consideration and/or a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours would incur debts beyond Chemours' ability to pay when those debts became due.

211.    The claims, judgment, and potential judgments against Chemours potentially exceed its ability to pay. Accordingly, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought herein and seeks to hold the DuPont Defendants liable for any

damages or other remedies that may be awarded by the Court or jury arising from this Complaint. Plaintiff further seeks all other rights and remedies that may be available to it, including prejudgment remedies as available under applicable law, as may be necessary for full compensation of damages and injuries Plaintiff has suffered as alleged herein.

## COUNT 8 – NEGLIGENT MISREPRESENTATION, FRAUD AND DECEIT

212.    Plaintiff realleges and reaffirms each and every allegation set forth in the foregoing paragraphs as if fully stated herein.

213.    This claim is brought under the Connecticut common law of misrepresentation, fraud and deceit.

214.    Defendants negligently, intentionally, and tortuously made false and misleading statements, and failed to disclose, omitted, concealed material facts.

215.    Defendants made misrepresentations and failed to disclose material facts to the public, consumers, and regulatory agencies throughout Connecticut and the United States, in order to induce consumers to purchase and consume AFFF without regard to its environmental and human effects, such that regulatory agencies did not investigate or set regulations regarding AFFF and PFAS.

216.    Specifically, the Defendants' known misrepresentations during the relevant period, which were intended to induce the continued purchase and environmental spread of AFFF, include but are not limited to:

  a.    Defendants misrepresented the benefits of AFFF in the context of the environmental and human, animal, and aquatic health;

  b.    Defendants misrepresented what they knew or should have known regarding  PFAS contamination from the foreseeable use of AFFF;

41

c.    Defendants misrepresented the environmental persistence of PFAS compounds;

d.    Defendants misrepresented the bio-availability and bio-accumulation of PFAS compounds related to AFFF use;

e.    Defendants misrepresented the carcinogenic nature of PFAS compounds related to AFFF use;

f.    Defendants failed to disclose the dangers to health or the environment inherent in AFFF use within the various MSDSs, instructions, warning labels, advertising, marketing, customer communications, regulatory communications, and product packaging for AFFF;

g.    Defendants misrepresented their actual and/or constructive knowledge of the adverse impacts from PFAS compounds to human health and the environment;

h.    Defendants falsely and deceptively portrayed their efforts and/or commitment to comply with the TSCA; and

i.    Defendants misrepresented the components of their AFFF products, including the breakdown compounds or substances.

217.    Defendants, in the relevant period and with the intent that others rely on their omissions or suppression of information, omitted material facts that Defendants had a duty to disclose by virtue of these Defendants' other representations, including but not limited to:

a.    AFFF contains PFAS chemicals, with the two most widely known and studied being PFOA and PFOS;

b.    PFOS is environmentally persistent;

c.     PFOA is environmentally persistent;

d.     Thousands of gallons of foam solution may be applied during a single release or discharge of AFFF;

e.     If it is not contained, the AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, sewers, surface water, and/or groundwater;

f.     AFFFs contain PFAS in their concentrate and formulation and/or has known or foreseeable by-products when the AFFFs are released into the environment;

g.     Once PFASs enter the environment, they are extremely persistent ad resistant to typical environmental degradation processes;

h.     PFASs are thermally stable synthetic organic contaminants, are carcinogenic, and cause ill effects to humans, animals, and aquatic life;

i.     PFASs have high water solubility (mobility), low biodegradation (persistence), and high bioaccumulation in humans, animals, and aquatic life;

j.     Exposure to PFOA and PFOS over certain levels can result in adverse health effects, including but not limited to developmental effects of fetuses during pregnancy or to breastfed infants, cancer, liver effects, immune effects, thyroid effects, and other effects;

k.     All PFAS compounds have generally demonstrated similar characteristics to PFOS and PFOA;

l.       Although some PFAS compounds have been shown to break down, the resulting products typically end at non-biodegradable PFOA or PFOS;

m.      Studies have shown that PFOS and PFOA, and other PFAS, have the potential to bio-accumulate and bio-magnify in wildlife and humans;

n.      That they failed to report to the EPA the substantial risk of injury to health or the environment from the discharge of AFFF;

o.      That they failed to prevent against PFAS contamination of numerous water sources;

p.      That they failed to conduct meaningful due diligence to ensure that its product did not contaminate the environment in a way that would pose a substantial risk of injury to health or the environment;

q.      Defendants' failure to disclose their financial ties to and role in connection with the FFFC, front groups, and deceptive literature and materials, as more fully described above; and

r.      Such other omission and concealments as described above in this Complaint.

218.    In each of the circumstances described *inter alia* the foregoing paragraph, Defendants knew that their failure to disclose rendered their prior representations untrue or misleading.

219.    In addition, and independently, Defendants had a duty not to deceive Plaintiffs because Defendants had in their possession unique material knowledge that was unknown, and not knowable, to Plaintiff, its agents, its community, and the public.

220.    Defendants intended and had reason to expect under the operative circumstances that Plaintiff, its agents, its community, and persons on whom Plaintiff and its agents relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that Plaintiffs would act or fail to act in reasonable reliance thereon.

221.    Defendants intended that Plaintiff, its agents, its community, and persons on whom Plaintiff and its agents rely would rely on these Defendants' misrepresentations and omissions; Defendants intended and knew that this reasonable and rightful reliance would be induced by these Defendants' misrepresentations and omissions; and, Defendants intended and knew that such reliance would cause Plaintiffs to suffer loss.

222.    Plaintiff rightfully, reasonably, and justifiably relied on Defendants' representations and/or concealments, both directly and indirectly. As the Defendants knew or should have known, Plaintiff was directly and proximately injured as a result of this reliance, and Plaintiff's injuries were directly and proximately caused by this reliance.

223.    As a result of these representations and/or omissions, Plaintiff proceeded under the misapprehension that the health effects that its population were suffering from were simply a result of conduct by persons other than Defendants. As a consequence, these Defendants prevented Plaintiff from a timelier and more effective response to PFAS contamination.

224.    Defendants' false representations and omissions were material and were made and omitted intentionally and recklessly.

225.    Defendants' misconduct alleged in this case is ongoing and persistent.

226.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort Plaintiff would reasonably expect to occur and is not part of the

normal and expected costs of a community or water provider's services. Plaintiff alleges wrongful acts which are neither discrete nor the sort a community or a water provider can reasonably expect.

227.    Plaintiff has incurred and/or will incur expenditures for special programs over and above ordinary water provider services.

228.    These Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

229.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

230.    Plaintiff has suffered monetary damages as aforesaid. As such Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendants, as well as attorney fees and costs and pre- and post-judgment interest.

## COUNT 9 – CIVIL CONSPIRACY

231.    Plaintiff realleges and reaffirms each and every allegation set forth in the foregoing paragraphs as if fully stated herein.

232.    Plaintiff brings this claim under Connecticut common law providing for the civil liability of persons who conspire to commit one or more unlawful acts.

233.    Defendants engaged in a common design between two or more persons to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, an overt act in furtherance of the conspiracy, and resulting injury to Plaintiffs.

234.    Defendants engaged in a combination and an agreement to act in concert in their tortious and/or otherwise fraudulent marketing of AFFF and safety of PFAS in Plaintiff's community.

235.    Defendants engaged in one or more unlawful activities to further the conspiracy. The objects of the conspiracy were fraud, misrepresentation, and other unlawful conduct as described above in this Complaint. Defendants knew that these objects were unlawful and would be accomplished by unlawful means such as fraud, misrepresentations, and omissions.

236.    Some Defendants, to the benefit of all Defendants, conspired with the Fire Fighting Foam Coalition ("FFFC") and other groups to commit unlawful or lawful acts in an unlawful manner. Defendants, the FFFC, and the various other groups with which each of them was allied, knowingly and voluntarily agreed to engage in unfair and deceptive practices to promote and distribute AFFF as an environmentally and health safe method for fire extinguishment by making and disseminating false and misleading statements and misrepresentations to distributors and consumers. Defendants enlisted and/or joined the FFFC and various other groups to make and disseminate these statements in furtherance of their common strategy to increase the sale and distribution of AFFF, and Defendants—along with the FFFC and various groups with whom each of them conspired—knew that the statements they made and disseminated served this purpose.

237.    Each of the participants to the conspiracies outlined above was aware of the misleading nature of the statements they planned to issue and of the role they played in the scheme to deceptively promote AFFF as safe and effective for the extinguishment of fires. These Defendants and third parties nevertheless agreed to misrepresent the risks, benefits, and superiority of using AFFF containing PFAS to Plaintiffs in return for increased sales and other benefits.

238.    Each of the participants to the conspiracies outlined above was aware of the nuisance resulting from their conduct and agreed to continue the practices described above that resulted in the maintenance of that nuisance.

239.    The Defendants worked together to ensure that the PFAS acceptable contamination level remained high and lobbied under the FFFC against lower contamination levels.

240.    The Defendants further worked together in their failure to monitor for and report that their AFFF presented a substantial risk of injury to health and the environment.

241.    The desired consistency and collective end goal was achieved. Defendants achieved profits through AFFF sales by orchestrating the belief to consumers that AFFF did not have adverse health effects.

242.    By reason of Defendants' unlawful acts, Plaintiff has been damaged and continues to be damaged by paying the costs of Defendants' externalities and has suffered and continues to suffer significant harm and damages special to Plaintiff and different in kind from those the general public may have suffered, including investigation, cleanup, remediation, and removal costs and damages related to the detection, treatment and removal of PFAS constituents that have and will continue to migrate into Plaintiff's water supplies, such that Defendants should be required by injunction to abate the nuisances they have created.

243.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, acted purposely, without a reasonable or lawful excuse, which directly caused the injuries alleged herein.

244.    Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

245.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

246.    As outlined above, Defendants played an active role in determining the substance of the misleading messages issued by FFFC and Front Groups, including providing content themselves, editing and approving content developed by their co-conspirators, and providing information for speaking engagements. Defendants further ensured that these misstatements were widely disseminated, by both distributing the misstatements themselves and providing their co-conspirators with funding and other assistance with distribution. The result was the wide spread of misleading information about the safety, risks, benefits, and superiority of using AFFF with PFAS. Defendants exercised direct editorial control over most of these statements. However, even if Defendants did not directly disseminate or control the content of these misleading statements, they are liable for conspiring with the third parties who did.

247.    Defendants' conduct in furtherance of the conspiracy described herein was not mere parallel conduct because each Defendant acted directly against their commercial interests in not reporting the health risks associated with AFFF use and PFAS contamination. Each Defendant acted against their commercial interests in this regard due to an actual or tacit agreement between the Defendants that they would not disclose the health risks of AFFF use, so they could all continue to profit from its sale.

248.    Defendants had a meeting of the minds on the object of or course of action for this conspiracy. Defendants knew and agreed upon the unlawful object or course of action for this conspiracy. Defendants also knew that their wrongful actions would inflict injury upon the targets of the conspiracy, including Plaintiffs.

249.    Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

250.    Defendants' misconduct alleged in this case is ongoing and persistent.

251.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergent of the sort of community of water provider would reasonably expect to occur and is not part of the normal and expected costs of a board of health's healthcare services. Plaintiff alleges wrongful acts which are neither discrete nor of the sort a community or water provider can reasonably expect.

252.    Plaintiffs have incurred expenditures for special programs over and above ordinary costs for providing drinking water to the community.

253.    Because of Defendants' dissemination of false information and misleading information of PFAS risks, benefits, and bioaccumulation, and false and misleading statements regarding the long-term health effects of AFFF use and contamination, Defendants are responsible for the costs incurred by Plaintiff.

254.    Defendants conspired to create a public nuisance and to commit tortious conduct and are therefore jointly and severally liable for the damages flowing from the conspiracy.

255.    Plaintiffs therefore request this Court to enter an order awarding judgment in its favor against Defendants, compelling Defendants to pay the direct and consequential damages, and awarding Plaintiffs such other, further, and different relief as this Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff THE FIRST TAXING DISTRICT OF NORWALK, CONNECTICUT respectfully requests that this Court:

A.  Enter judgment finding Defendants jointly and severally liable for all costs and damages incurred by Plaintiff, including but not limited to prior, interim and future capital as well as operation and maintenance costs related to PFAS contamination; including the reasonable costs of sampling, investigations, and assessment of injury, and destruction or loss resulting from PFAS contamination;

B.  Enter judgment finding Defendants jointly and severally liable for cleanup and removal costs and damages, including but not limited to prior, interim and future capital as well as operation and maintenance costs, including the reasonable costs of assessing injury, destruction or loss resulting from the discharges, and threatened discharges;

C.  Enter judgment finding Defendants liable for punitive damages;

D.  Enter judgment finding Defendants liable for consequential damages;

E.  Enter judgment requiring, via injunction, Defendants to abate the nuisance they have created;

F.  Award Plaintiff costs and reasonable attorney fees incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

G.  Award Plaintiff such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Demand is hereby made for a trial by jury.

Dated: May 25, 2023.

Attorneys for the Plaintiff

By:

/s/ T. Roe Frazer II
T. Roe Frazer II
Thomas Roe Frazer III
**FRAZER PLC**
30 Burton Hills Boulevard, Suite 450

Nashville, Tennessee 37215
(615) 647-0990
roe@frazer.law
trey@frazer.law


/s/Agostinho Riberio
Agostinho Riberior
Nicole L. Barber
Ventura Law
235 Main Street
Danbury, CT 06810
(203) 800-8000
augie@venturalaw.com
nicole@venturalaw.com